IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

MARCUS T.,

               Plaintiff,

vs.

FRANK BISIGNANO, Commissioner
of Social Security,

               Defendant.

8:25-CV-416

MEMORANDUM AND ORDER

This matter is before the Court on the denial of plaintiff Marcus T.'s application for disability insurance benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq*., 1381 *et seq*. The Court has considered the parties' filings and the administrative record. For the reasons discussed below, the Court finds that the Commissioner's decision was not supported by substantial evidence, so the plaintiff's motion for reversal (filing 13) will be granted, and the Commissioner's motion for an order affirming the decision (filing 18) will be denied.

## I. PROCEDURAL HISTORY

The plaintiff protectively filed for disability insurance benefits and supplemental security income on May 26, 2021, alleging disability beginning March 30, 2021. Filing 8-2 at 11. His claims were denied initially and on reconsideration. He requested a hearing before an administrative law judge (ALJ), which occurred on March 6, 2023. Filing 8-2 at 40. Following that hearing, the ALJ determined the plaintiff was not disabled within the meaning of the Social Security Act. Filing 8-2 at 16.

The plaintiff appealed, and the Appeals Council denied review. Filing 8-

2 at 2. The plaintiff sought judicial review in this Court of the final decision of the administration under 42 U.S.C. § 405(g). On May 20, 2024, the undersigned granted an unopposed motion to remand the case. *See* filing 9-4.

The plaintiff then had a second hearing before the same ALJ on February 10, 2025. The ALJ again found the plaintiff was ineligible for benefits, and the Appeals Council denied the plaintiff's second appeal. Filing 9-1 at 2. The plaintiff now seeks the Court's review of that decision as the final decision of the administration. Filing 1.

## II. FACTUAL BACKGROUND

### 1. MEDICAL AND WORK HISTORY

The plaintiff was born in 1976 and lives in Lincoln, Nebraska, with his wife and stepdaughter. Filing 8-6 at 5; filing 9-5 at 14; filing 9-1 at 48. He has a 10th grade education. He most recently operated a forklift at a manufacturing company, until March 30, 2021; before that, he was a production line worker in the same company, since at least 2007. Filing 8-6 at 7. His initial application for disability included complaints of "depression, head injury, vertigo, and anal tear." *See* filing 8-6 at 6.

In March 2021, the plaintiff had unexplained lightheadedness and dizziness. He reported to the emergency room (ER) on March 4, but all tests, including a CT scan, were normal, except an EKG showed sinus rhythm and acute ST changes. Filing 8-7 at 55. He was given a Zio patch to monitor his heart and told to follow up in primary care. The plaintiff returned to the ER on March 11, but again his vitals and tests, including a second CT, were normal, and he was referred to primary care. Filing 8-7 at 4-5.

The plaintiff did not have a primary care physician, so he established care with Dr. Boshra Rida, MD, on March 12, 2021. Filing 8-7 at 117. He

2

explained he was dizzy frequently and had frequent headaches, but felt better when lying down. He reported he had fallen a month before, but he did not hit his head. Dr. Rida started him on meclizine twice per day to help with the dizziness, and the plaintiff was told avoid driving. Filing 8-7 at 119. The plaintiff was concerned about working, because he didn't feel comfortable operating a forklift while he was dizzy.

Dr. Rida also referred the plaintiff to physical therapy, which he started a few days later. Filing 8-7 at 51. He experienced dizziness with position changes. Filing 8-7 at 50. The records indicate the plaintiff only went to physical therapy twice before he was discharged for too many cancellations and no-shows. Filing 8-7 at 49.

The plaintiff returned to Dr. Rida on June 22, 2021. He was still feeling dizzy, now with fogginess and some nausea. Filing 8-7 at 122. He told Dr. Rida he had stopped working because of lightheadedness. He identified two triggers of dizziness: anxiety and "moving too fast." The plaintiff also told Dr. Rida he had numbness and tingling in his right hand. Dr. Rida referred the plaintiff to an ENT and told the plaintiff to manage his headaches with Tylenol, not NSAIDs. Filing 8-7 at 122. At the ENT, the tests were normal, and the plaintiff was referred to a neurologist. Filing 8-7 at 25; *see* filing 8-7 at 122.

The plaintiff again went to the ER with dizziness, depression, and fatigue on July 9, 2021. Filing 8-7 at 41. The work-up was "generally unremarkable," and nothing emergent was suspected; a CT scan was negative for acute intracranial abnormality. Filing 8-7 at 44. The plaintiff was discharged with instructions to follow up with primary care. He saw Dr. Rida on July 27 via telemedicine, but his treatment was not modified. Filing 8-7 at 123.

The plaintiff saw a neurologist, Dr. James Bobenhouse, M.D., to evaluate

3

his dizziness and lightheadedness, on September 22, 2021. Filing 8-7 at 135. The ENT had not identified a cause for the dizziness and had ruled out benign paroxysmal positional vertigo, *see* filing 8-7 at 25, so Dr. Bobenhouse ordered an EEG, an MRI of the brain, and labs. Filing 8-7 at 135. He also started the plaintiff on prednisone. Filing 8-7 at 137.

On November 2, 2021, Dr. Bobenhouse discussed with the plaintiff the lab workup, a normal EEG, and the brain MRI. The MRI showed "several left centrum semiovale and left corona radiata hypodensities as well as a left anterior capsular hypodensity consistent with tiny old infarcts." Filing 8-7 at 138.[1] Dr. Bobenhouse started the plaintiff on aspirin therapy and atorvastatin. He also arranged a CT angiogram and other tests to further evaluate the plaintiff's internal carotid artery, and arranged for other labs. Filing 8-7 at 140. The testing, performed on November 16, indicated "50% stenosis involving the proximal right" internal carotid artery. *See* filing 8-7 at 141; filing 8-7 at 207.[2]

On December 6, 2021, the plaintiff had a fistulectomy as a result of ongoing rectal pain caused by an anal fistula and a rectal abscess. *See* filing 8-

---

[1] It appears that Dr. Bobenhouse believed the plaintiff suffered a stroke at some point before this appointment. *See* filing 8-7 at 140 (discouraging behavior that "would tend to increase his risk for *further* strokes" (emphasis added)); *see Taber's Cyclopedic Medical Dictionary* 1982 (Donald Venes, et al. eds., 19th ed. 2001) ("80% of strokes are caused by cerebral infarctions"). When the plaintiff had visited the ER or his doctor, no MRI was performed, so the stroke (or strokes) likely escaped detection. *See* filing 8-7 at 4, 41, 44, 55.

[2] "Internal carotid artery" stenosis reduces the flow of oxygen to the brain and creates a risk of strokes. *Carotid Artery Stenosis*, Johns Hopkins Medicine: Conditions and Diseases, https://www.hopkinsmedicine.org/health/conditions-and-diseases/carotid-artery-disease (last visited Apr. 28, 2026).

4

7 at 190; filing 8-7 at 184. To prepare for the surgery, he had to stop his aspirin regimen. *See* filing 8-7 at 403. This caused him to have a "hand knob" stroke on or about December 7, 2021. *See* filing 8-7 at 209, 404.

The plaintiff went to the ER on December 7 with paresthesia in his right hand and arm. The ER records from that date diagnose him with "TIA (transient ischemic attack)," filing 8-7 at 209, 220, "Previous TIA's," filing 8-7 at 215, "History of TIA," filing 8-7 at 216, and "Acute ischemic stroke," filing 8-7 at 226. Neurology performed a CT, which showed different results than the November 16 imaging, but it was "unclear" if there was "any change or if artifact is playing a role in the differing reports." Filing 8-7 at 209. An MRI indicated "[p]ossible small acute ischemic infarct in the left frontal lobe posteriorly." Filing 8-7 at 231. The plaintiff was told to follow up with Dr. Bobenhouse in two months. Filing 8-7 at 215.

The plaintiff saw Dr. Bobenhouse on February 18, 2022. Dr. Bobenhouse diagnosed the plaintiff as having had a "[l]eft lateral precentral guys ('hand knob') stroke on December 7, 2021 following cessation of his aspirin therapy." Filing 8-7 at 404. Dr. Bobenhouse increased his aspirin and discussed surgery—an extracranial/intracranial bypass procedure. Filing 8-7 at 402. Ultimately, the plaintiff chose not to go forward with the surgery because the procedure, which involved taking a vein from his neck and putting it in his brain, scared him. Filing 9-6 at 86.

The plaintiff saw Dr. Bobenhouse again on August 2, 2022. The plaintiff reported ongoing dizziness and lightheadedness, unsteady walking, and headaches. He also reported the meclizine was not helpful. Dr. Bobenhouse discontinued the meclizine, continued the plaintiff's aspirin therapy, and told the plaintiff to try a Transderm scopolamine patch to help with the nausea and dizziness. Filing 8-7 at 442, 446, 462.

When the plaintiff returned to Dr. Bobenhouse in June 2023, he again reported ongoing dizziness, lightheadedness, and marked fatigue. Filing 9-6 at 8. Dr. Bobenhouse prescribed Cymbalta for the plaintiff's depression and referred him to primary care for concerns of hypertension. He also scheduled a CT angiogram of the plaintiff's brain and cervical vessels, and continued aspirin therapy and atorvastatin. Filing 9-6 at 12. The angiogram indicated mild to moderate ICA stenosis. The results were "slightly worse than on prior studies." Filing 9-6 at 3.

The plaintiff continued regular visits with primary care throughout 2023 and 2024. He had a new primary care provider, Megan Simpson, APRN-NP, beginning in 2024. Filing 9-6 at 31, 37; filing 9-6 at 86; filing 9-6 at 77. On January 3, 2025, he told Simpson he was feeling dizzy and depressed, and he was bruising easily. Simpson told him to use Dramamine for dizziness and said that the bruising was likely related to his aspirin therapy. She prescribed fluoxetine for his depression instead of the Cymbalta, and referred him to physical therapy. Filing 9-6 at 63.

The plaintiff started vestibular physical therapy with Carrie Rohr, DPT, a few days later. Filing 9-6 at 92. He went four times in January, consistently reporting that the dizziness and fatigue were not going away. Filing 9-6 at 98, 100, 103, 106. Rohr noted that the plaintiff seemed cautious about the exercises.

## 2. MEDICAL OPINIONS

Dr. Travis Groft, PhD, performed a consultative psychological examination of the plaintiff at the request of the state agency in January 2022. *See* filing 8-7 at 382. Dr. Groft diagnosed the plaintiff with "Minor Neurocognitive Disorder Due to Stroke." Filing 8-7 at 386. He opined that the

plaintiff was "likely to face numerous challenges" in the workplace; specifically, that the plaintiff would likely need "enhanced supervision and accommodation," and that he would have "difficulty in adapting to change or learning new roles." *Id.* He wrote that the plaintiff

> appears to have some significant cerebrovascular problems that have resulted in multiple mild strokes, according to the history available to me, and related problems with gait, cognition, and balance. He appears to be still experiencing some possible active symptoms. At this moment, his prognosis for recovery to his previous baseline is poor.

*Id.* Dr. Groft indicated he had "limited information" about the plaintiff's stroke history, which made it impossible to fully understand the plaintiff's neurological condition. *Id.* He recommended a "neuropsychological assessment" to "shed light on [the plaintiff's] cognitive strengths and weaknesses, and their likely impact on employability." Filing 8-7 at 387.

Stefanie Leyden, APRN, another state consultant, conducted a physical examination in January 2022. She opined that the plaintiff had limitations in standing, walking, lifting, and carrying. Filing 8-7 at 397. Leyden wrote that the plaintiff reported cognitive changes, "but nothing on exam substantiates that without a psych eval[.]" Filing 8-7 at 397.

Dr. Thomas Martin, MD, a non-examining agency medical consultant, opined that the plaintiff "may have moderate limitations with remembering/carrying out more complexed [sic] tasks as well as maintaining [attention/concentration] for extended periods," consistent with the plaintiff's reports of difficulty focusing. Filing 8-3 at 7. Dr. Martin also provided opinions

about physical limitations involving balancing, lifting, climbing, heavy machinery, and vibrations. Filing 8-3 at 6-7.

Dr. Lee Branham, PhD, another non-examining consultant, opined that the plaintiff had moderate limitations in the ability to understand, remember, or apply information, and to concentrate, persist, or maintain pace, and moderate limitations in the his ability to understand and remember detailed instructions, maintain attention or concentration, perform activities on a schedule, maintain regular attendance, be punctual, and complete a normal workday and workweek. Filing 8-3 at 10. Dr. Branham found mild limitations in the plaintiff's ability to interact with others and to adapt or manage himself. Filing 8-3 at 7.

On reconsideration, other non-examining consultants' findings were no different from the above limitations. Filing 8-3 at 25-26.

### 3. ADMINISTRATIVE HEARINGS

The plaintiff's first hearing before the ALJ was in March 2023. Filing 8-2 at 40. He testified that he did not finish the tenth grade, and he never obtained a GED or any other education. He said he has problems writing, spelling, and reading. Filing 8-2 at 50.

The plaintiff described his dizziness—that it "comes and goes" every day. Filing 8-2 at 51. He had to "take it slow" in the mornings and he got dizzy after adjusting from laying down to standing up. Filing 8-2 at 51. He also described "severe tiredness," and how he felt fatigued after simple chores like taking out the trash. He said he had to lay down after 25 minutes or so of activity. Filing 8-2 at 53-54. He explained that he was unable to safely perform his job operating a forklift because he would get dizzy, and he had a hard time focusing and keeping up with the production line. Filing 8-2 at 48. The plaintiff clarified

8

that his "focus" problems included both his eyes not being able to focus because he's dizzy, but also affected his mental thinking and concentration. Filing 8-2 at 65. The plaintiff also discussed his depression. Filing 8-2 at 56-58.

The plaintiff also testified that he had problems with lightheadedness and focusing while driving, so the most he would drive was "right up the street" to visit family. Filing 8-2 at 52. He also felt uncomfortable as a passenger in a car. He testified that his wife (fiancée at the time) had to remind him to complete tasks at home because he couldn't remember or focus. Filing 8-2 at 58-59. However, he could go to the grocery store if his wife gave him a list. Filing 8-2 at 66.

A vocational expert identified three sedentary jobs that a hypothetical person could do if he can "perform simple tasks" and can "exercise proper judgment in performing those tasks." Filing 8-2 at 68. The expert identified three jobs from the Dictionary of Occupational Titles, but testified those jobs would not be available for a person who needed hourly supervisor check-ins or a person who needed frequent breaks or was slower paced. Filing 8-2 at 69.

The plaintiff's second hearing, in February 2025, was much the same. He testified about his anxiety, lightheadedness, headaches, and dizziness. Filing 9-1 at 35, 39. He said he was most comfortable, and the least dizzy, when laying on his side. Filing 9-1 at 38. The plaintiff also described problems focusing during conversations or activities with family members, and how he couldn't remember what someone said mid-conversation or what is happening on television. Filing 9-1 at 37.

### 4. SEQUENTIAL ANALYSIS AND ALJ FINDINGS
#### (a) Steps One and Two

The ALJ found that the plaintiff was not disabled and he was not entitled

9

to benefits.[3] Filing 9-1 at 6. To determine whether a claimant qualifies for disability benefits, an ALJ performs a five-step sequential analysis of the claim. 20 C.F.R. § 404.1520(a)(4). At the first step, a claimant has the burden to establish that he has not engaged in substantial gainful activity since the alleged disability onset date. *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006); § 404.1520(a)(4)(i).

Regarding step one, the ALJ found that the plaintiff met the insured status requirement of the Social Security Act through September 30, 2026, and that the plaintiff had not engaged in substantial gainful activity since March 30, 2021, the plaintiff's alleged onset date. Filing 9-1 at 7.

At step two, the medical severity of a claimant's impairment is considered. § 404.1520(a)(4)(ii). The claimant has the burden to prove a medically determinable physical or mental impairment, or combination of impairments, that significantly limits his physical or mental ability to perform basic work activity. *Gonzales*, 465 F.3d at 894.

The ALJ found the following severe medically determinable impairments: vascular insult to the brain, neurocognitive disorder, depressive disorder, and anxiety disorder. Filing 9-1 at 8. The ALJ found the plaintiff's anal fistula and accompanying rectal pain were non-severe. Filing 9-1 at 8.

### (b) Step Three

At step three, the medical severity of a claimant's impairments is further considered. § 404.1520(a)(4)(iii). If a claimant's impairments meet or equal a presumptively disabling impairment listed in the regulations, the analysis ends, and a claimant is automatically found disabled and entitled to benefits.

---

[3] Only the operative ALJ opinion, from February 27, 2025, is detailed in this Order.

*Gonzales*, 465 F.3d at 894. The ALJ found that the plaintiff's impairments, considered singly or in combination, did not meet or equal any specific listing. Filing 9-1 at 8.

The ALJ determined the plaintiff's vascular insult did not meet the requirements of 20 C.F.R. Part 404, Subpart P, Appx. 2, § 11.04, because the medical record did not establish sensory or motor aphasia affecting speech or communication, disorganization of motor function, or a marked limitation in physical and mental functioning. Filing 9-1 at 8.

The ALJ also considered the plaintiff's mental impairments. He considered the "paragraph B criteria," contained in 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00 *et seq*. Four "broad functional areas" are used to evaluate mental limitations: "Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." § 404.1520a(c)(3). The ALJ concluded that the plaintiff had a moderate limitation in understanding, remembering, or applying information; a mild limitation in interacting with others; a moderate limitation in concentrating, persisting, or maintaining pace; and a moderate limitation in adapting or managing himself. Filing 9-1 at 9-10. None of these limitations warranted a finding that the plaintiff was disabled. The ALJ based much of his conclusions on the plaintiff's conduct at the hearings, the plaintiff's ability to participate in the consultative exams, the plaintiff's self-reported conduct, and the plaintiff's ability to communicate with healthcare providers.

### (c) Steps Four and Five

At step four, a claimant has the burden to prove that he lacks the residual functional capacity (RFC) to perform his past relevant work. *Gonzales*, 465 F.3d at 894; §§ 416.920(a)(4)(iv) & (f), 404.1520(a)(4)(iv) & (f). If a claimant

11

can still do his past relevant work, he will be found to be not disabled; otherwise, the analysis proceeds to step five. At step five, the burden shifts to the Commissioner to prove, considering a claimant's RFC, age, education, and work experience, that there are other jobs in the national economy that a claimant can perform. *Gonzales,* 465 F.3d at 894; §§ 416.920(a)(4)(v) & (g), 404.1520(a)(4)(v) & (g).

At step four, the ALJ found that the plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a), except he is able to occasionally stoop, kneel, crouch, and crawl, frequently "handle and finger," and he is able to "perform work that does not require sustained exposure to concentrated vibration, climbing ladders, or other exposure to hazards (such as work at unprotected height or operating motor vehicles)." Filing 9-1 at 10. Mentally, the ALJ found the plaintiff is able to perform simple tasks, exercise proper judgment in performing those tasks, and respond appropriately to routine changes in the workplace. *Id.*

The ALJ determined the plaintiff's statements about the intensity, persistence, and limiting effects of his lightheadedness, fatigue, and headaches were not entirely consistent with the medical evidence and other evidence in the record. Filing 9-1 at 12. The ALJ found that the plaintiff's neurological examinations were essentially normal, though the ALJ did not cite to the particular part of the record on which he relied.[4]

While state agency psychological consultants opined that the plaintiff

---

[4] The medical record shows no indication the plaintiff's cognition was ever evaluated. When he reported to the ER with dizziness or other presumably stroke-related symptoms, he was tested for neurological deficits associated with an ongoing stroke. *See, e.g.,* filing 8-7 at 4, filing 8-7 at 207. But the Court cannot identify even a suggestion in the record that any of the plaintiff's treating physicians ever evaluated his cognition as a result of *past* strokes.

had "moderate limitations remembering and carrying out more complex tasks and maintaining attention and concentration," the ALJ found those opinions unpersuasive and speculative. He wrote that the opinions were not "clearly support[ed]" by medical evidence, and instead the consultants relied on the plaintiff's "reports of difficulty focusing and history of tiny infarcts." Filing 9-1 at 16.

The ALJ also found unpersuasive Dr. Groft's opinion that the plaintiff could not carry out instructions under ordinary supervision. Filing 9-1 at 16-17. The ALJ reasoned that Dr. Groft's "clinical observations" did not support the conclusion, and instead Dr. Groft based his opinion on the plaintiff's reported limitations. The ALJ determined that the plaintiff's "intact mentation, judgment, behavior, and memory on other occasions," apparently evidenced at some intermittent ER visits, "were inconsistent with his assessed inability to sustain attention and concentration" in the everyday workplace. Filing 9-1 at 17.

The ALJ determined the plaintiff could not perform past relevant work. Based on the plaintiff's RFC, age, education, and work experience, and relying on the vocational expert's testimony from the hearing, the ALJ identified three different representative occupations with significant numbers in the national economy that the plaintiff could perform. Filing 9-1 at 18. Those jobs were "final assembler," "patcher," or "printed circuit board screener." The ALJ confirmed that the vocational expert's testimony was consistent with the Dictionary of Occupational Titles. Based on those findings, the ALJ found the plaintiff was not disabled.

13

## III. STANDARD OF REVIEW

The Court reviews a denial of benefits by the Commissioner for errors of law and to determine whether the denial is supported by substantial evidence on the record as a whole. *Byes v. Astrue,* 687 F.3d 913, 915 (8th Cir. 2012) (citing 42 U.S.C. § 405(g)). Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion. *Id*. The Court considers the entire administrative record—the evidence that detracts from the decision, as well as the evidence that supports it—but the evidence is not reweighed. *See id*. Instead, the Court will disturb the ALJ's decision only if it falls outside the available "zone of choice.*" Kraus v. Saul,* 988 F.3d 1019, 1024 (8th Cir. 2021). If the record contains evidence that a reasonable person might accept as adequate to support the ALJ's decision, the Court may not reverse—even if it would reach a different conclusion, or if there is evidence that might support a contrary outcome. *See id*.; *Byes,* 687 F.3d at 915.

## IV. DISCUSSION

The plaintiff argues that the ALJ failed to fully and fairly develop the record. In particular, the plaintiff argues that the medical record is "sparse" regarding his dizziness and related cognitive impairments, so the ALJ failed to adequately develop the record by requiring an independent consultative neuropsychological examination to assess the plaintiff's neurocognitive impairments. Filing 14 at 19. To support his argument, the plaintiff asserts state agency consultative examiners recommended a further examination. Filing 8-7 at 387; filing 8-7 at 397.

An ALJ's RFC determination is a medical question that "must be supported by some medical evidence" of a claimant's ability to function in the

14

workplace. *Lawrence v. Saul*, 970 F.3d 989, 995 (8th Cir. 2020) (quoting *Steed v. Astrue*, 524 F.3d 872, 875 (8th Cir. 2008)); *see also Combs v. Berryhill,* 878 F.3d 642, 646 (8th Cir. 2018). The ALJ bears a responsibility to develop the record fairly and fully, independent of the represented claimant's burden to press his case. *Combs,* 878 F.3d at 646; *see also* 20 C.F.R. § 404.1520b; *Johnson v. Astrue,* 627 F.3d 316, 319–20 (8th Cir. 2010). He "may not simply draw on his own inferences about plaintiff's functional ability from medical reports," nor may he "play doctor" and substitute his own opinions for those of a physician. *Combs,* 878 F.3d at 647.

In this case, the ALJ limited the plaintiff to "simple tasks," but the RFC included no limitations about "enhanced supervision and accommodation" or difficulties adapting, as described by Dr. Groft. *See* filing 9-1 at 10. The support for this determination came from the plaintiff's self-reported daily activities and two citations in the record purporting that the plaintiff "demonstrated normal speech, behavior, memory, mentation, and judgment." Filing 9-1 at 15; *see* filing 8-7 at 47, filing 9-6 at 62.

But, looking to the ALJ's citations to the record and beyond, the Court cannot identify any such medical evidence about the plaintiff's "normal speech, behavior, memory, mentation, and judgment" in a workplace setting. During primary care and ER visits, the plaintiff was noted to be "oriented to person, place, and time," *see* filing 9-6 at 62, 77, 88; filing 8-7 at 47, 57, or "alert" and without focal or neurological deficits, *see* filing 8-7 at 43, 47. None of these records or observations shed any light on the plaintiff's ability to function in the workplace.

Nothing in the record supports the ALJ's conclusion that the plaintiff is without neurocognitive deficits disrupting his ability to work. The plaintiff's treating physicians never evaluated him for ongoing cognitive issues that could

be caused by a history of TIAs. The only provider to consider the plaintiff's cognition in the workplace was Dr. Groft, who indicated further evaluation was necessary to fully understand the plaintiff's workplace limitations. Filing 8-7 at 387.

Because the ALJ found Dr. Groft's opinions about the plaintiff's mental limitations to be unpersuasive, and because there was no other *medical* evidence upon which to rely, there is no substantial evidence supporting the ALJ's determination of the plaintiff's RFC. "By relying on his own interpretation" of the ER and primary care records, "the ALJ failed to satisfy his duty to fully and fairly develop the record." *See Combs*, 878 F.3d at 646. For these reasons, this case will be remanded so that the ALJ "may conduct further inquiry" as to the plaintiff's cognitive function in the workplace. *See id.*

The plaintiff's other arguments—that the ALJ did not provide adequate reasons for finding the consultative examiner's opinions unpersuasive or finding the plaintiff was not credible—are related to the above issue. The challenged ALJ determinations will necessarily be reevaluated on remand, so the Court declines to address the other arguments.

IT IS ORDERED:

1.    The plaintiff's motion for reversal of the Commissioner's final decision (filing 13) is granted.

2.    The Commissioner's motion to affirm the Commissioner's final decision (filing 18) is denied.

3.    This case is reversed and remanded to the Commissioner for further proceedings consistent with this opinion.

16

4.    A separate judgment will be entered.

Dated this 29th day of April, 2026.

BY THE COURT:

John M. Gerrard
Senior United States District Judge